Edward W. Swanson, SBN 159859
ed@smllp.law
Britt Evangelist, SBN 260457
britt@smllp.law
SWANSON & McNAMARA LLP
300 Montgomery Street, Suite 1100
San Francisco, California 94104
Telephone: (415) 477-3800
Facsimile: (415) 477-9010

Attorneys for BRANDON FRERE

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>        v.<br><br>BRANDON FRERE<br><br>        Defendant. | CASE NO. 3:19-cr-00493-SI<br><br>**DEFENDANT BRANDON FRERE'S SUBMISSION REGARDING RESTITUTION**<br><br>Restitution Hearing: September 1, 2021<br>Time: 4:00 p.m.<br>Court: Hon. Susan Illston |

1
2

**TABLE OF CONTENTS**

3      I.      INTRODUCTION ................................................................................................ 1

4      II.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND ..................................... 1

5        A.    Overview of Mr. Frere's Business Operations and Offense Conduct ................................ 1

6        B.    Relevant Procedural Background .................................................................. 2

7        C.    Outreach to the Victims of Mr. Frere's Fraud ................................................... 3

8      III.    THE GOVERNMENT'S RESTITUTION REQUEST ...................................................... 4

9      IV.     LEGAL STANDARD ................................................................................................ 5

10     V.      DEFENDANT'S RESTITUTION RECOMMENDATION ............................................... 6

11       A.    The Court Should Reduce the Restitution Award by the Cost of the Document ..................
12             Preparation Services .................................................................................... 6

13           1.   Mr. Frere's document preparation business responded to a consumer need and
14                included a processing department to meet that need ......................................... 7

15           2.   The victim impact statements contain examples of customers who did not
16                experience an actual loss ............................................................................ 10

17
18       B.    The Government Has Not Carried its Burden to Show all Individuals who Paid for
19             the Benefit's Program are Victims of Fraud .................................................... 19

20       C.    The Court Should Award Restitution to the Individuals who Submitted Victim
21             Impact Statements and Order the Government to Take Appropriate Action to
22             Identify Any Other Victims and Their Actual Loss Amounts in the 60 Days
               Following the Court's Order ...................................................................... 22

23
24     VI.     THE FUNDS FORFEITED BUT RETURNED TO VICTIMS AS RESTITUTION
               SHOULD BE CREDITED AGAINST ANY RESTITUTION AWARD IMPOSED
25             BY THE COURT ...................................................................................... 24

26     VII.    THE COURT SHOULD SET A REASONABLE REPAYMENT SCHEDULE FOR
27             MR. FRERE ............................................................................................ 24

28
       VIII.   CONCLUSION ........................................................................................ 25

i

**Defendant's Restitution Submission**
*United States v. Brandon Frere*

1

2

# TABLE OF AUTHORITIES

3

## FEDERAL CASES

4

*In re Her Majesty the Queen in Right of Canada*, 785 F.3d 1273 (9th Cir. 2015) ....................... 5

*United States v. Anderson*, 741 F.3d 938 (9th Cir. 2013) ................................... 5, 6, 21

*United States v. Beecroft*, 825 F.3d 991 (9th Cir. 2016) ................................... 5

*United States v. Calderon*, 944 F.3d 72 (2d Cir. 2019) .................................. 5

*United States v. Kaplan*, 839 F.3d 795  (9th Cir. 2016) ................................. 5

*United States v. Luis*, 765 F.3d 1061 (9th Cir. 2014) ................................ 5

5

6

7

8

9

10

## FEDERAL STATUTES

11

18 U.S.C. § 3664(e) .................................................................................. 5

18 U.S.C. § 3664(f)(2) ............................................................................ 24

21 U.S.C. § 853(i)(1) .............................................................................. 23

12

13

14

15

## MISCELLANEOUS

16

Ben Miller, *Annual Paperwork Should Not Stand in the Way of Affordable Student-Loan Payments*, Center for American Progress, Aug. 31, 2016 ........................................ 8

Federal Student Aid, *Do you have questions about the different types of income-driven repayment plans?* .................................................................. 13

Federal Student Aid, *If your federal student loan payments are high compared to your income, you may want to repay your loans under an income-driven repayment plan* .......................... 14

Minsky, Adam S., *How Student Loan Servicing Changes Will Impact Public Service Loan Forgiveness* (Forbes, Jul. 12, 2021) ............................................. 13

Zack Friedman, *99% of Borrowers Rejected Again for Student Loan Forgiveness*, Forbes, May 1, 2019 ........................................................................ 7

17

18

19

20

21

22

23

24

25

26

27

28

ii

**Defendant's Restitution Submission**
*United States v. Brandon Frere*

## I.    INTRODUCTION

Defendant Brandon Frere ("Mr. Frere") stands convicted of one count of wire fraud and one count of money laundering arising from the student loan document preparation and related businesses he previously ran.  The government asks the Court to award restitution to every customer of Mr. Frere's businesses in an amount equal to the total amount those customers paid, minus any refunds.  The government rests its restitution calculation on spreadsheets of data it received from third party payment processors used by Mr. Frere's businesses.  The government's restitution calculation, however, does not account for the fact that some of Mr. Frere's customers were not harmed by his fraud and did not experience an actual loss.  The government has therefore not carried its burden under the restitution statute to prove all the individuals listed in the government's restitution request are victims and experienced an actual loss.

As explained below, Mr. Frere proposes the Court award restitution to all individuals who submitted victim impact statements in this case and that the government be given 60 days to re-contact other customers and solicit information from them that would establish their entitlement to restitution as well.

## II.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.    Overview of Mr. Frere's Business Operations and Offense Conduct

Mr. Frere's companies operated two different, but interrelated, lines of business.  The first was a student loan document preparation service business, which assisted borrowers who wished to apply for federal loan forgiveness, loan consolidation, and reduced monthly payment programs through the Department of Education ("DOE").  Dkt. 59 at 3 (plea agreement).  The second was a benefits program that offered "products and services related to consumers seeking to understand and improve their finances."  *Id.*  Under the benefits program, customers could sign up for services such as LifeLock identity theft protection and roadside assistance.  *Id.*

From 2011 to 2015, the company was operated as the American Financial Benefits Center ("AFBC") and sold the document preparation service as a package with the benefits program.  In 2015, AFBC was split into two separate companies: Ameritech and FEBC.  From 2015 until the business ceased operations, Mr. Frere's employees offered the document

1

preparation services through Ameritech and simultaneously sold the benefits package, for a separate fee, through FEBC.  The companies charged $800 for the document preparation services and between $49 and $99 per month for membership in the benefits program.  *Id*. at 3.

The fraudulent sales practices that existed on both sides of Mr. Frere's business are described in detail in the plea agreement.  *Id*. at 3-5.  With regards to the document preparation side of the business, Mr. Frere instructed his employees to falsely tell customers that his company could secure enrollment in loan repayment and forgiveness programs and to use enrollment practices that improperly inflated a customers' "family size."  Family size is a key metric used by the DOE to calculate monthly payments under the various income-driven repayment and loan forgiveness programs.  *Id*. at 4.  Federal regulations define and limit persons who can be included in a borrower's family size.  *Id*.  Mr. Frere instructed his enrollment associates to provide misleading examples of family members, resulting in customers claiming larger family sizes and thus qualifying for lower monthly student loan payments than the regulations allowed.  *Id*. at 4-5.  On the benefits program side of the business, Mr. Frere instructed his enrollment associates to use misleading sales scripts and tactics that obscured the existence and cost of the benefits program.  This caused his customers to "believe that they were only purchasing the document preparation services and that all of the fees and costs they agreed to pay were related to either the document preparation services or their monthly payments to their loan servicers" (*id*. at 5), when in fact they were paying for the benefits program.

## B.     Relevant Procedural Background

On February 7, 2018, the Federal Trade Commission ("FTC") filed a complaint against Mr. Frere and his companies praying for an order suspending the operation of the companies, permanently enjoining Mr. Frere and his companies from further violating the FTC Act and appointing a receiver to oversee the companies.  *FTC v. American Financial Benefits Center*, *et al*., No. 18-cv-0806 (N.D. Cal.), Dkt. 1.  On March 2, 2018, the FTC filed a motion for a preliminary injunction, and the Court issued the injunction and appointed a receiver on November 29, 2018.  *Id*. at Dkt., 22, 186.  On December 21, 2018, the receiver issued an order

2

finding that Mr. Frere's businesses could not operate both legally and at a profit and informing the court that he (the receiver) would cease all operations of the businesses.  Dkt. 204.

While the FTC and its receiver pursued civil remedies and recovery against Mr. Frere, the United States Attorney's Office for the Northern District of California began conducting a criminal investigation.  On December 5, 2018, the government brought various criminal charges against Mr. Frere.  *See United States v. Brandon Frere*, No. 18-mj-71724-SK (N.D. Cal.), Dkt. 1.  The parties shortly thereafter engaged in settlement negotiations, and on December 20, 2019, Mr. Frere pled guilty.  Dkt. 1, 59.

On July 24, 2020, the Court, pursuant to a Rule 11(c)(1)(C) plea agreement, sentenced Mr. Frere to 42 months imprisonment, followed by three years of supervised release.  Dkt. 76.  The plea agreement provides for an award of restitution to be imposed "as determined by the Court" and stipulates that Mr. Frere agrees to "to pay full restitution for all losses caused by" his conduct.  Dkt. 59, ¶¶ 8, 10.  The plea agreement, however, does not contain a range within which the restitution award must fall, nor does it provide for a minimum award amount.

The Court did not impose a restitution judgment at sentencing.  The parties requested and the Court ordered the restitution hearing delayed to allow the government time to produce documents and information pertinent to its restitution request, and to allow Mr. Frere sufficient time to evaluate that request.  Dkt. 75 (minute order).  Due to delays caused by the COVID pandemic and by the need for the parties to review the large amount of information and documents relevant to the restitution issue, the date for the restitution hearing was continued several times.  Dkt. 77, 82, 86, 92, 96.

### C.    Outreach to the Victims of Mr. Frere's Fraud

In June and August of 2018, the FTC reached out to Mr. Frere's customers, informing them of the illegal business practices and the resulting lawsuit and inviting them to contact the FTC to share their experiences with Mr. Frere's companies.  Declaration of Britt Evangelist in Support of Defendant Brandon Frere's Submission Regarding Restitution ("Evangelist Decl."), **Exhibit A** (June 2018 and August 2018 FTC letters to Ameritech, FEBC, and AFBC customers).

3

After Mr. Frere pled guilty in December 2019, the government notified Mr. Frere's customers of his plea and asked that they complete a victim impact statement by April 30, 2020. *Id*. at **Exhibit B** (victim notification letter and email).  The government also posted notice of the guilty plea, the sentencing date, and the request for victim impact statements to the U.S. Attorney's Office website.[1]  The government received responses from approximately 1,551 individuals.  Declaration of Amy McGuigan in Support of Defendant Brandon Frere's Submission Regarding Restitution ("McGuigan Decl."), ¶ 6. [2]

## III.    THE GOVERNMENT'S RESTITUTION REQUEST

Mr. Frere understands the government intends to seek a restitution judgment of more than $42,000,000 in connection with payments made by 42,543 AFBC, Ameritech, and FEBC customers.[3]  Mr. Frere further understands the government bases its request on spreadsheets and payment data it subpoenaed from his companies' third-party payment processors – AMP, GCS, Meritus Payments, and RAM.  Evangelist Decl., ¶ 3.[4]  These companies produced spreadsheets itemizing and aggregating the funds each company withdrew from each AFBC, Ameritech and FEBC customer, along with any refunds the customers received.  The government thus calculates

---

[1] Available at: https://web.archive.org/web/20200407023158/https://www.justice.gov/usao-ndca/united-states-v-brandon-demond-frere; *see also* Department of Justice Public Notification at https://www.justice.gov/usao-ndca/united-states-v-brandon-demond-frere

[2] Per the Court's order at sentencing, Mr. Frere has reviewed all Victim Impact Statements produced by the government and is concurrently filing a declaration attesting thereto.

[3] As explained in the concurrently filed declaration of Amy McGuigan, in June 2021 the government produced spreadsheets to defense counsel itemizing and aggregating the payment processor data on which its analysis relies.  Defense counsel used the data in the June 2021 spreadsheet to calculate the restitution recommendation made in this brief.  The government produced an updated version of this spreadsheet on August 24 and four related spreadsheets on August 25.  Undersigned counsel has begun to analyze these new spreadsheets to determine if any of the data contained therein changes the figures in Mr. Frere's restitution recommendation below and will be prepared to address any such changes at the hearing on September 1.

[4] As part of the enrollment process for document preparation services, customers of Mr. Frere's companies signed authorizations allowing these payment processors to withdraw the fees for the document preparation services and the benefits program from their bank accounts.  These companies were also used to pay refunds to Mr. Frere's customers.

4

**Defendant's Restitution Submission**
*United States v. Brandon Frere*

the restitution owed by Mr. Frere as the sum of all monies paid by AFBC, Ameritech and FEBC customers, as documented by the payment processors, minus all documented refunds.

## IV.   LEGAL STANDARD

"[T]he purpose of the [Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A] is to fully compensate victims for their losses, and to restore victims to their original state prior to the criminal act." *United States v. Kaplan*, 839 F.3d 795, 800 (9th Cir. 2016).  "The MVRA defines the word 'victim' as 'a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered.'" *United States v. Anderson*, 741 F.3d 938, 951 (9th Cir. 2013) (quotations and citations omitted).  Where, as here, the crime of conviction is mail fraud or wire fraud, a court is authorized to order restitution "for all persons directly harmed by the entire scheme," and the "restitution order may be based on related but uncharged conduct" so long as it is part of the fraud scheme for which the defendant has been convicted.  *In re Her Majesty the Queen in Right of Canada*, 785 F.3d 1273, 1276 (9th Cir. 2015).  "Because the goal of restitution is to make the victim whole, 'any award is limited to the victim's actual losses.'" *United States v. Beecroft*, 825 F.3d 991, 996 (9th Cir. 2016) (citing and quoting *Anderson*, *supra*); *see also Kaplan*, 839 F.3d at 802 ("[I]t would be an abuse of discretion for a district court to issue a restitution award that makes a victim more than whole, such as by awarding a windfall."); *United States v. Calderon*, 944 F.3d 72, 94 (2d Cir. 2019) ("Where intended [for sentencing purposes] loss is incorporated to punish a culpable defendant, 'restitution is designed to make the victim whole ... and must therefore be based only on the actual loss caused by the scheme.'" (citation omitted)).

18 U.S.C. § 3664 sets forth the procedure for issuance of orders of restitution under the MVRA.  "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence." 18 U.S.C. § 3664(e). "The government bears the burden of proving that a person or entity is a victim for purposes of restitution." *United States v. Luis*, 765 F.3d 1061, 1066 (9th Cir. 2014).  It is also "the government's burden to establish that the victim suffered an actual loss in a quantifiable amount." *Anderson*, 741 F.3d at 954.

5

**Defendant's Restitution Submission**
*United States v. Brandon Frere*

While "[t]he MVRA requires ... some precision when calculating restitution[,].... exact precision is not required and district courts do have a degree of flexibility in accounting for a victim's complete losses." *Anderson*, 741 F.3d at 951.  Although "a reasonable estimate will suffice," (*id*.), this not a license to engage in "back-of-the-envelope" approximations, "speculation [, or] rough justice" in determining the amount of a restitution award.  *Id*. at 953-54.  "Where the alleged loss is not quantifiable to any degree of certainty, the government's burden has not been satisfied, and no restitution should be ordered."  *Id*. at 954.

## V.     DEFENDANT'S RESTITUTION RECOMMENDATION

### A.     The Court Should Reduce the Restitution Award by the Cost of the Document Preparation Services

As set forth in the plea agreement, Mr. Frere accepts responsibility for implementing misleading practices on the document preparation side of his business, which admittedly caused many of his customers to purchase his companies' services.  It is a fact that some number of Mr. Frere's customers purchased document preparation services which turned out to be worthless to them because at the time of their enrollment they did not qualify for a reduced loan repayment or forgiveness program, despite being told by Mr. Frere's employees that they would.  It is also a fact that some number of his customers did not understand that Mr. Frere's employees were encouraging them to improperly inflate their family size numbers, and had they known of the scheme being perpetrated, they would not have engaged his companies' services.  Mr. Frere agrees with and does not dispute these facts.  But these facts are not universally true for all document preparation customers.  Not all customers were misled or deceived, and some experienced no actual loss as a result of engaging Mr. Frere's companies.  The government's restitution request makes no attempt to distinguish between customers who were victimized by his fraud and suffered an actual loss and those who did not.  As a result, the government has not met its burden to prove that all individuals identified in its restitution spreadsheet are victims who experienced an actual loss under the MVRA.   *Anderson*, *supra*, at 951, 954.

**Defendant's Restitution Submission**
*United States v. Brandon Frere*

1.  <u>Mr. Frere's document preparation business responded to a consumer need and included a processing department to meet that need</u>

As the Court is aware, for many in this country the crushing burden of student loan debt accelerated rapidly over the last two decades. *The Department's Communication Regarding the Costs of Income-Driven Repayment Plans and Loan Forgiveness Programs*, at 3, Jan. 31, 2018 (the "outstanding principal balance of the Department's student loan portfolio of direct and guaranteed loans nearly doubled in the last 7 years, from $687 billion at the end of FY 2009 to $1.209 trillion at the end of FY 2016.");[5] Federal Student Aid, Office of the U.S. Dep't of Education, FY2017 Annual Report, Nov. 30, 2017, at 9 (by 2018, over 44.2 million Americans held outstanding student loan debt totaling approximately $1.45 trillion).[6]  And while the government created loan forgiveness and income-driven repayment ("IDR") programs to provide some relief,[7] for many borrowers, the process of successfully navigating the enrollment process for these programs is extremely confusing and remains challenging.  Borrowers must identify programs for which they may be eligible, prepare detailed documentation, often consolidate and restructure some or all of their loans, and then submit and follow up on their applications.  If

---

[5] Available at: https://www2.ed.gov/about/offices/list/oig/auditreports/fy2018/a09q0003.pdf

[6] Available at: https://www2.ed.gov/about/reports/annual/2017report/fsa-report.pdf

[7]  The DOE implemented several programs intended to reduce borrowers' monthly repayment obligations and provide full or partial loan forgiveness.  These income-driven repayment ("IDR") programs require borrowers to make either 10, 20, or 25 years of payments on their loans at a reduced rate based on their income, family size and specific loan factors.  At the conclusion of the program the principal balance and accrued interest will be forgiven.  IDR is the umbrella term used for the various loan repayment and forgiveness programs available through DOE.  The more popular IDR programs available include the Income-Based Repayment Plan ("IBR"), under which a borrower pays either 10% or 15% of their discretionary income, and the Income-Contingent Repayment Plan ("ICR"), under which a borrower pays the lesser of 20 percent of their discretionary income or what the borrower would pay on a fixed rate repayment plan of 12 years.  *See* Federal Student Aid, *If your federal student loan payments are high compared to your income, you may want to repay your loans under an income-driven repayment plan*. (providing overview of IDR programs such as the IBR, ICR, PAYE, and REPAYE), available at: https://studentaid.gov/manage-loans/repayment/plans/income-driven.  The Public Service Loan Forgiveness ("PSLF") program provides full loan forgiveness with no tax consequences to borrowers enrolled in an IDR who meet specific requirements regarding fulltime non-profit or governmental employment.  *Id*.

7

**Defendant's Restitution Submission**
*United States v. Brandon Frere*

accepted into an IDR program, they must also successfully recertify their eligibility with their loan servicer each year by continuing to meet income, family size, loan type requirements, and re-submission deadlines.  This has led many borrowers to not enroll in programs for which they may qualify or to fall out of their repayment and loan forgiveness program by failing to recertify their eligibility each year.  *See* Zack Friedman, *99% of Borrowers Rejected Again for Student Loan Forgiveness*, Forbes, May 1, 2019 (2019 DOE study revealing that 99% of applications for the PSLF program were rejected by servicers due to incomplete information on the application or otherwise not meeting the "type of loan" requirements for the program)[8]; Ben Miller, *Annual Paperwork Should Not Stand in the Way of Affordable Student-Loan Payments*, Center for American Progress, Aug. 31, 2016 ("IDR plans have one major flaw: the need to annually reapply each year.  This seemingly minor paperwork issue trips up nearly 60 percent of student-loan borrowers and results in potentially dire consequences. Reapplication is a hidden trap in IDR plans.").[9]

In an attempt to meet borrowers' need for assistance with the application and recertification process, Mr. Frere designed, created, and set up a document preparation business, first under AFBC and later under Ameritech.  Mr. Frere did not have a model to follow when he started his business.  He and other early employees taught themselves the complexities of the student loan landscape and the labyrinth of programs available to borrowers, perhaps, to a degree that no one besides the loan servicers and regulators themselves had achieved at the time.  That early effort resulted in a do-it-yourself three-part how-to book series on student loan repayment programs that the company sent to each of its customers.  *See* Evangelist Decl., **Exhibit C** (Declaration of Tom Knickerbocker, former Ameritech Executive Vice President, ¶¶ 3-4, explaining how Mr. Frere and others spent "hundreds of hours" learning about the student loan

---

[8] Available at:  https://www.forbes.com/sites/zackfriedman/2019/09/09/99-rejected-for-student-loan-forgiveness-again/#46d57a086675

[9] Available at: https://www.americanprogress.org/issues/education-postsecondary/news/2016/08/31/143150/annual-paperwork-should-not-stand-in-the-way-of-affordable-student-loan-payments/

**Defendant's Restitution Submission**
*United States v. Brandon Frere*

space and then published a series of books).[10]  They created an internal "Knowledge Base" or wiki database about the student loan programs, unique loan servicer practices, and loan program nuances, that was used as a resource guide by the Processing Department, Customer Service Department, and other key departments in Mr. Frere's company.  Employees used and added to the Knowledge Base to memorialize and make available important information about the loan programs and about how to solve problems or answer questions that arose during the processing sequence of a customer's application.  Management also distributed procedural handbooks and reference sheets to help employees learn about the various loan programs and accurately navigate the various application processes.[11]  And the company put its employees through a two-week training program to have them certified as Student Loan Professionals through the International Association of Professional Debt Arbitrators (IAPDA).[12]  Mr. Frere and his employees spent considerable time and resources developing a back-office processing department that helped borrowers find and enroll in a loan repayment program that could benefit them.  *See* Evangelist Decl., **Exhibit B** (Knickerbocker Decl., ¶¶ 4-5, explaining the work done at the companies to evaluate their customers' student loan situation, identify the best loan repayment program for them, and optimize their chances of benefiting from that program); *see also id.* (exhibit 20 to Knickerbocker Decl., a flow chart of work done by the companies' processing department).  Using this information, the staff of the processing department spent many hours working with customers to get them out of default status and to submit the necessary

---

[10] Mr. Knickerbocker filed this declaration in connection with the civil action brought by the Federal Trade Commission against Mr. Frere and his businesses, *FTC v. American Financial Benefits Center, et al.*, No. 18-cv-0806 (N.D. Cal.).  Copies of the books are attached to Mr. Knickerbocker's declaration as Exhibits 1 to 4.

[11] *See* Evangelist Decl., **Exhibit D**, a "Customer Service Reference Binder" that was used by Customer Service representatives to answer questions regarding the loan programs that frequently arose during customer service calls; **Exhibit E**, an "Overview of Income Drive Repayment Plan" that was used as a reference sheet by employees; **Exhibit F**, "New Customer Frequently Asked Questions for Rehabilitation Program"; **Exhibit G**, a "Consolidation Rules" cheat sheet; and **Exhibit H**, a "PSLF Study Guide" and accompanying "Exam."

[12] *See* Evangelist Decl., **Exhibit I**, a listing of the company's certified Loan Professionals from the IAPDA website and the IAPDA Training Module.

9

**Defendant's Restitution Submission**
*United States v. Brandon Frere*

paperwork to navigate the complex processes established by the loan servicers and the DOE. Over the course of their existence, the companies enrolled nearly 20,000 individuals into various repayment and loan forgiveness programs and reduced borrowers' monthly payments by an average of over $200. *Id.* at ¶¶ 9-10.[13]

 2. The victim impact statements contain examples of customers who did not experience an actual loss

While Mr. Frere readily admits that the misrepresentations and deceitful conduct described in his plea agreement plagued the document preparation side of his business, he submits they did not occur in each and every transaction. For some of the document preparation customers, family size inflation did not occur, and the companies did provide the services paid for.[14] To illustrate this fact, counsel compiled a list of 228 victims who submitted victim impact statements with family sizes between 1 and 3, and thus whose document preparation services do not have indicia of improper family size inflation. McGuigan Decl., **Exhibit 1** (spreadsheet).[15]

---

[13] In 2016 Mr. Frere and others at his companies established a Compliance Department to monitor sales calls and to identify and halt misrepresentations and deceptive sales practices. *See* Evangelist Decl., **Exhibit J** (Declaration of Chuck Ganganath, former Ameritech Vice President of Operations, describing the compliance program). Mr. Frere admits he created the misleading practices at issue in this case before formation of the Compliance Department, that following the creation of the Compliance Department he tolerated the same practices, that he did not enforce the compliance measures in a manner that could have quashed the deceptive sales practices, and that, at times, he actively undermined the Compliance Department's efforts. For all these reasons he rightfully stands convicted of fraud, even though some of the companies' fraudulent practices were reformed. Evangelist Decl., **Exhibit K** (Report of Receiver at 7-18, describing how document preparation business had ceased some of the deceptive sales practices, such as using deceptive mailers and telling clients that the company could guarantee enrollment in loan repayment programs, while other misleading sales practices continued).

[14] And Mr. Frere's companies did not enroll every potential customer who called. In 2017, over 87% of customer calls did not result in a sale. *FTC v. American Financial Benefits Center, et al.*, No. 18-cv-0806 (N.D. Cal.), Dkt. 79-55 at ¶ 14.

[15] There is reason to believe that not all IDR applications for individuals with family sizes greater than three were the result of fraud. During the enrollment process, each client (with the assistance of Ameritech personnel) answered the questions posed on a DOE form entitled Income-Driven Repayment (IDR) Plan Request ("Request Form"). Evangelist Decl., **Exhibit L** (examples of Request Forms). The Request Form provided the legal definition of family size, asked the applicant to disclose their family size per that definition, and also required the

10

**Defendant's Restitution Submission**
*United States v. Brandon Frere*

The data in the spreadsheet, forensically recovered from a Salesforce backup for the companies,[16] includes contemporaneous notes created by company employees chronicling the work they performed on these customers' files.  These Processing Notes and Consolidation Notes reflect meaningful work by the companies' employees to help their customers apply (and potentially qualify) for various IDR and loan forgiveness programs.  The notes use abbreviations and shorthand, which can render them hard to follow, but a careful reading of the notes in conjunction with the documents attached to some of the victim impact statements submitted to the Court shows that real work was performed for Mr. Frere's customers and that they received a real benefit from the money they paid to Ameritech.

Take the example of a customer named M.T.  Documents submitted in support of M.T.'s victim impact statement show that when he enrolled in the document preparation program, he had $171,072 in federal loans, a family size of one, and was attempting to make monthly student loan payments of $1,188 on annual income of less than $15,000.  FRERE-VIS-006672.[17]  Based on the information provided by M.T., the company estimated that his monthly loan payment would be $20 in an IDR program.  By the time Mr. Frere's businesses shuttered, the company had consolidated his loans to a single loan servicer and qualified him for a $0 per month IDR payment program, a program in which he was still enrolled at the time he submitted his victim impact statement to the government.

This work is shown in the Processing Notes and Consolidation Notes at **Exhibit 1** to the Declaration of Amy McGuigan and confirmed by the records submitted by M.T.  The Consolidation Note of August 25, 2017, reads "[a]ll loans to NN," (*id*. at Row 154, Column E)

---

applicant to attest to the accuracy of the information in the form.  No doubt many of Mr. Frere's clients applied for IDR programs using an improper family size number because Mr. Frere's sales practices led them to believe they could lawfully include individuals who did not actually meet the definition.  Others, however, reported true family sizes on their IDR applications.

[16] *See* Declaration of Alan Lee filed concurrently herewith, explaining the forensic processes used to recover this data.

[17] The victim impact statements cited in this section are attached as **Exhibit M** to the Declaration of Britt Evangelist and paginated in order of the Bates stamp numbering.

**Defendant's Restitution Submission**
*United States v. Brandon Frere*

and reflects a company employee with the initials "JMW" performing a consolidation of M.T.'s eligible federal loans into a new loan serviced by Nelnet as the first step in processing this customer's file.[18]  That the consolidation took place is confirmed by the loan statement submitted by M.T., which shows his loans were "disbursed" a month later, on September 29, 2017. FRERE-VIS-006665.[19]

The Processing Notes for M.T. read:

> **10/12/18 SENT Reapp w/2017 TR, calc $0**. MGR  -----------------
>
> **10/12/17 Sub'd IDR via FSA (Pulled 2015 TR), no FSL, $0 Calc**. - LWH
>
> 9/1/17 Rec'd 2016 IDR, Gen Forb, 2015 1040 S ($4,365), Stubs 7/27 8/30, Bank Info (in lieu of voided check) - RMV
>
> 8/29/17 Rec'd 2016 IDR, Gen Forb, TPAs FL Nav NN GL, 2015 1040 S ($4,365), Stubs 7/27 - RMV
>
> 8/28/17 Emailed IDR, Forb-SNH Pre-Forb Status Check by Miguel Flores

McGuigan Decl., **Exhibit 1** at Row 154, Column D.

The October 12, 2017, entry (bolded above) reads "Sub'd IDR via FSA (Pulled 2015 TR), no FSL, $0 Calc," and translated indicates the company employee submitted ("Sub'd") an IDR application through the Federal Student Aid ("FSA") portal,[20] without including a Family

---

[18] Loan consolidation is often the first step in the application process for IDR and loan forgiveness programs, because consolidating multiple loans into one federal loan can make the loans eligible for those federal programs.  Federal Student Aid, *Should I consolidate my loans?* (explaining "pros" and "cons" of consolidation and including as a pro, "If you consolidate loans other than Direct Loans, consolidation may give you access to additional income-driven repayment plan options and Public Service Loan Forgiveness (PSLF)), available at: https://studentaid.gov/manage-loans/consolidation.

[19] When multiple federal loans are consolidated into a single new loan, the date of the consolidation is often reflected as a disbursement of the new loan.

[20] *See* https://studentaid.gov/fsa-id/sign-in/landing

12

**Defendant's Restitution Submission**
*United States v. Brandon Frere*

Size Letter ("no FSL"),[21] and that he or she estimated the application would result in a $0

monthly payment ("$0 Calc").  A year later, an entry dated October 12, 2018 (bolded above)

reads "SENT Reapp w/2017 TR, calc $0," which translated means the company employee

submitted ("SENT") an annual IDR recertification application ("Reapp") along with M.T.'s 2017

tax return ("w/2017 TR"), and that the employee estimated M.T.'s student loan payment would

remain at $0 per month ("calc $0").  The loan statement submitted by M.T. again confirms these

events, because it shows that even as of February 26, 2020 (the date of the statement), M.T.

continued to have a $0 monthly student loan payment.  FRERE-VIS-006665.[22]

      In his victim impact statement M.T. says his experience with Mr. Frere's companies

caused him damage in the form of overdraft fees, the accumulation of over $11,000 in interest,

and other financial hardship and embarrassment resulting from the companies' misleading him

into believing that they would assist him in reducing his student loan.  FRERE-VIS-006660 to

FRERE-VIS-006664, at questions 5, 12, 14, 15, and 17.  One can completely understand and

empathize with the financial stress and hardship experienced by M.T., but counsel submits that

they were not caused by Mr. Frere and his companies.  Rather, the records reflect that M.T.

received the document preparation services that M.T. contracted for: the company consolidated

---

[21] Loan servicers sometimes required the companies' customers to submit a signed letter attesting to and verifying the client's family size.  The Processing Notes show that one was not needed for M.T.'s application.

[22] The February 2020 loan statement shows that M.T.'s loans are now being serviced by FedLoan Servicing ("FedLoan") and that his eligibility for the PSLF program is under review by the servicer.  FedLoan, until very recently, was the federal loan servicer servicing individuals who applied for the PSLF program.  *See* Minsky, Adam S., *How Student Loan Servicing Changes Will Impact Public Service Loan Forgiveness* (Forbes, Jul. 12, 2021) (describing how FedLoan, who had been the primary servicer for PSLF eligible loans, will not renew its contract with the DOE), available at: https://www.forbes.com/sites/adamminsky/2021/07/12/how-student-loan-servicing-changes-will-impact-public-service-loan-forgiveness/?sh=497960ef2f06.  The DOE automatically transfers a borrowers' loans to FedLoan after receiving a PSLF application.  Federal Student Aid, *So Your Loan Was Transferred, What's Next?* ("We also transfer loans when borrowers sign up for programs, such as Public Service Loan Forgiveness (PSLF). Today, only one of our loan servicers exclusively handles accounts enrolled in the PSLF Program, so those accounts get transferred to that servicer regularly."), available at: https://studentaid.gov/articles/your-loan-was-transferred-whats-next/.

13

**Defendant's Restitution Submission**
*United States v. Brandon Frere*

his loans, helped him apply for an IDR program that reduced his monthly payments from nearly $1,200 to $0, and then helped him to successfully re-certify a year later for that same IDR and loan forgiveness program.

It is true that M.T. may have accumulated more interest in the years since entering the IDR program[23] than he would have had he not applied for the IDR program, but that is what happens when your monthly payment on $171,072 of student loans is reduced from nearly $1,200 to $0 per month and does not cover the monthly interest accruing on your principal balance.  Of course, if M.T. sticks with the IDR program and completes the requisite 10, 20 or 25 years of qualifying monthly payments (depending upon the IDR plan), "any remaining loan balance [will be] forgiven if [his] federal student loans aren't fully repaid at the end of the repayment period."[24]  M.T. may feel that he has not benefited from engaging Mr. Frere's companies and entering into an IDR program at this time because his student loan balance has not changed.  But that is the nature of an IDR and the federal loan forgiveness programs.  While enrolling into an IDR will immediately reduce a borrower's monthly payment, interest will continue to accrue, and the borrower will only see a reduction in their student loan balance once they have completed the 10-to-25-year loan forgiveness program.  It is understandable that this delayed benefit may be experienced by the borrower as no benefit at all, but that results from the

---

[23] The government may have subsidized M.T.'s accruing interest for some period of time. Federal Student Aid, *Do you have questions about the different types of income-driven repayment plans?* ("Under the REPAYE, PAYE, and IBR plans (but not the ICR Plan), the government will pay all or a portion of the interest that isn't covered by your monthly payment (see next paragraph)."), available at https://studentaid.gov/manage-loans/repayment/plans/income-driven/questions.

[24] Federal Student Aid, *If your federal student loan payments are high compared to your income, you may want to repay your loans under an income-driven repayment plan* (describing the IDR programs available to borrowers, including how monthly payments are calculated and the length of each program), available at: https://studentaid.gov/manage-loans/repayment/plans/income-driven.

**Defendant's Restitution Submission**
*United States v. Brandon Frere*

nature of the DOE student loan re-payment and loan forgiveness programs, not the services provided by Mr. Frere's companies.[25]

A similar story emerges from the documents and notes related to a customer named S.B. The Processing Notes for S.B. read:

9/7/18 Sub'd reapp via fax to GL with 2016(S) Tax return, calc $0-DMS

9/7/18 - Updated Great Lakes portal. WRM -------------------------------------------- ---------------------------------

10/25/17 Sub'd IDR as wish-to-enter "lowest" via fax to GL with 2016 TR, Calc $0, no FSL-DMS

8/30/17 Rec'd Stub 8/18 8/4 8/25 8/11 GenForb 2016 IDR Void Check 2016 1040EZ S ($356.84)-KKB

8/28/17 Emailed IDR, Forb-SNH

McGuigan Decl., **Exhibit 1**, Row 196, Column D.

Starting from the bottom, these notes reflect that a company employee with the initials SNH emailed an IDR and forbearance form ("Emailed IDR, Forb") to the customer on August 28, 2017, and then on August 30, 2017, received back from the customer four weekly paycheck stubs ("Rec'd Stub 8/18 8/4 8/25 8/11"), the signed federal forbearance form, a copy of the customer's 2016 tax return, a signed IDR form, and voided check ("Gen Forb 2016 IDR Void Check 2016 1040EZ S"). The notes then reflect that on October 25, 2017, the company employee submitted the completed IDR form ("Sub'd IDR") pursuant to the customer's stated "wish-to-enter [sic] 'lowest'" repayment plan. The IDR was submitted to the loan servicer Great Lakes ("via fax to GL"), with the customer's 2016 tax return ("2016 TR"), no Family Size Letter ("no FSL"), resulting in an estimated student loan payment of $0 per month ("Calc $0"). A year later, in September 2018, a company employee submitted a recertification on behalf of S.B. ("Sub'd reapp via fax to GL"), again estimating a $0 per month payment ("calc $0"). The

---

[25] As to the overdraft fees experienced by M.T., Mr. Frere does not dispute they occurred and that they were experienced as a hardship by M.T., but he notes M.T. twice reauthorized Mr. Frere's companies to deduct automatic payments from his accounts (FRERE-VIS-006689, 006693, 6695), thus indicating he knew and understood the fees and costs associated with the services he purchased.

15

**Defendant's Restitution Submission**
*United States v. Brandon Frere*

Processing Notes track what appears in S.B.'s victim impact statement.  Like the Processing Notes, S.B.'s statement reflects her desire to reduce her monthly loan payments as much as possible.  *See* FRERE-VIS-009483, question 5 (S.B. explaining she engaged Mr. Frere's companies because her "student loan payments were too much").  And, consistent with the Processing Notes, S.B.'s statement shows she was placed in a $0 per month repayment plan with the Great Lakes loan servicer.  FRERE-VIS-009504 to FRERE-VIS-009519 (Great Lakes monthly statements from April 2018 to December 2018 reflecting $0 monthly payments).

S.B. faults Mr. Frere and his companies for causing excess interest to accrue on her loan balances (FRERE-VIS-009484, question 6; FRERE-VIS-009486, question 15), which in turn caused her increased stress and financial hardship.  FRERE-VIS-009486, question 12; FRERE-VIS-009485, question 9.  As in the case of M.T., excess interest may have accrued on S.B.'s loans after she enrolled in the IDR program, but that is how the IDR programs function.  Mr. Frere's companies, however, did what they contracted to do: they reduced her monthly student loan payments, which "were too much," to the "lowest" possible amount of $0 per month.

The Processing Notes and victim impact statement of a customer named M.P. reflect an experience like S.B.'s and M.T.'s.  The Processing Notes for M.P. read:

> 6/25/18 - Updated FSA portal. Sub'd reapp #2 via Nelnet w/ 2016 TR, calc $0. WRM --------------------------------------------------------------------
>
> 6/22/17 Sent Reapp via FSA to Nelnet w/ 2016 TR, No FSL, calc $10. - CES
>
> 6/22/2017 rec'd 1040[2016]AGI($31,454.00)S 2016 IDR stub 6/1 6/15 5/18 -SLC
>
> 6/16/17 emailed IDR. customer will send tax and stubs to see if his current income will reduce the IDR even more. ~NSS.
>
> 6/15/17 reviewed account. because Nelnet will sometimes send out an approval letter stating $0 it doesn't always mean $0. On payment schedule IBR was approved for $55.37 that started on 9/24/16~NSS.
>
> 5/24/17 - Rec'd TPA NelNet - JTW --------------------------------------------------- -------------------
>
> 8/23/16- Letter in inbox says IBR was approved at $0 but payment schedule says $55.37. Please do a 3 way call with servicer and get them to change payment schedule to $0 as the approval letter states -smm

16

**Defendant's Restitution Submission**
*United States v. Brandon Frere*

6/8 Rec'd IBR & Nelnet Statement

6/7- all loans back to NN. Need to manually add loans for consolidation

6/6 rec'd 1040[2015]AGI($34,670.00) sending customer docs needed.

6/3- corrected birth date

McGuigan Decl., **Exhibit 1**, Row 163, Column D.

Starting at the bottom, these notes show that the customer engaged Mr. Frere's companies in June 2016.  The company employees performed a loan consolidation ("all loans back to NN. Need to manually add loans for consolidation") and then attempted to help the customer navigate the fact that the loan servicer (Nelnet) had "sen[t] out an approval letter stating $0" would be the customer's monthly payment but was then sending billing statements for $55.37 per month.  It appears the employee helped M.P. resolve the issue favorably, because the 2016 bank statements attached to M.P.'s victim impact statement do not reflect monthly payments of $55.37 to Nelnet, indicating his monthly payment was indeed reduced to $0.  *See* FRERE-VIS-016593 to FRERE-VIS-016622.  The next year, in June 2017, the company assisted M.P. with recertifying for the IDR ("Sent Reapp via FSA to Nelnet with 2016 TR"), which resulted in an estimated monthly payment of $10 ("calc $10").  *See also* FRERE-VIS-016646 (IDR request form signed by MP on 6/20/2017).  The bank statements attached to M.P.'s victim impact statement reflect an October 24, 2017, payment to Nelnet of $10.31.  FRERE-VIS-016623.  A year later, the company submitted a second recertification for the customer with an estimated $0 monthly payment ("Sub'd reapp #2 via Nelnet w/ 2016 TR, calc $0").  M.P.'s victim impact statement confirms that he was (and perhaps still is) in a $0 per month IDR program through Nelnet.  FRERE-VIS-016587, question 5.  As with M.T. and S.B., Mr. Frere's companies performed work for M.P. that resulted in a lower monthly student loan payment and potential loan forgiveness later.  Customers like M.T., S.B., and M.P. did not experience actual loss from engaging Mr. Frere's companies to perform student loan document preparation services.  They received the very assistance with loan payment reductions that they paid for.  The Processing Notes at **Exhibit 1** to the Declaration of Amy McGuigan (made contemporaneously

17

with the work performed) show the companies' employees performed the same earnest work on behalf of many other customers, proving the experiences of M.T., S.B., and M.P., are not outliers.[26]

In calculating its restitution number, however, the government made no effort to distinguish customers like M.T., S.B., and M.P. from those who were deceived into agreeing to the document preparation services.  The government instead relies on spreadsheets of data from the payment processors that show only the amounts paid by and refunded to the companies' customers.  The government's calculation assumes that all 42,543 of Mr. Frere's customers had the same sales experience, which resulted in the same outcome – the provision of a service completely worthless to the customer.  As demonstrated above, that assumption is by no means universally true.

The victim impact questionnaires drafted by the government also fail to ask questions which could have enabled the parties and the Court to determine if individual customers had been harmed by Mr. Frere's conduct and experienced an actual loss.  For example, the questionnaire could have asked customers to disclose the family size number used in their IDR application and whether that number was accurate under an appropriate definition of the term.  Likewise, the questionnaire could have asked customers whether they recall being promised a certain outcome if they paid for the companies' services.  Finally, the government's questionnaire could have asked each customer to disclose if Mr. Frere's companies successfully helped them apply for an IDR program that reduced their monthly payments, the amount of the

---

[26] Undersigned counsel selected the files of M.T., S.B., and M.P., because these individuals attached documents (e.g., loan statements, bank account statements) to their victim impact statements or made statements therein that allowed counsel to verify the accuracy of the companies' Processing Notes.  Other examples exist in the victim impact statements.  *Compare* Processing Notes for customer V.J. at McGugian Dec., **Exhibit 1**, Row 221, Column D (showing IBR submitted in December 2016 -- "12/6/16 Sub'd IBR w/o FSL" – and then recertified in December 2017 – "12/11/17 SENT Reapp w/2015 TR, Calc $0") *with* FRERE-VIS-003010 (servicer statement showing V.J. enrolled in IBR program with $0 monthly payment).  Mr. Frere, however, does not have access to documents and information that could verify the Processing Notes for the vast majority of his companies' customers.  Only the government has access to the documents and information showing whether Ameritech clients successfully applied for an IDR program, because only the government can ask either the individual clients or the DOE to produce relevant (and potentially corroborating) information and records.

18

**Defendant's Restitution Submission**
*United States v. Brandon Frere*

reduction, whether they are still enrolled in the IDR program today, and if not, why. If a customer's answers to these questions reveal that an individual did not qualify for an IDR program and was never enrolled or that they were enrolled only temporarily until the DOE discovered family size inflation in their application, they would be considered a victim with an actual loss under the MVRA. If, on the other hand, a customer's answers to these questions show the companies helped them enroll in an IDR program and they continue to enjoy enrollment in that program or that they dropped out of that program for unrelated reasons, then they would not be considered a victim under the MVRA and would have experienced no loss.

Answers to questions such as these would have allowed the Court and the parties to determine which individuals in the government's spreadsheet are indeed victims under the MVRA and their actual loss amount. The government failed to ask these or similar questions and instead chose to rely on payment processing data that reflects only the net payments by the companies' customers, and as a result the government has not carried its burden to prove by a preponderance of the evidence which of the 42,543 individual customers were "directly and proximately harmed," or the actual loss amount suffered by those individuals. *Anderson*, 741 F.3d at 951-54. Because the government has not met its burden to prove the actual loss to each customer actually defrauded by the document preparation business, the Court should reduce any restitution reward by the $800 cost of those services for each customer.[27]

## B. The Government Has Not Carried its Burden to Show all Individuals who Paid for the Benefit's Program are Victims of Fraud

The government's restitution request also assumes that customers who purchased the benefits program were defrauded. In the unique factual circumstances of this case, however, this is not a reliable assumption on which an award of restitution can be based.

---

[27] Applying this reduction to the amounts in the spreadsheet produced by the government in June results in a figure of $22,540,962.16. McGuigan Decl., ¶ 5. The defense is continuing to review the new spreadsheet produced by the government on August 24 to determine if this number is still accurate and will be prepared to provide a new figure to the Court at the restitution hearing. *Id*. at ¶ 6.

**Defendant's Restitution Submission**
*United States v. Brandon Frere*

First, while Mr. Frere does not dispute that he instructed his employees to use deceptive practices that were intended to and did obscure the existence and costs of the benefits program from many of his customers, unlike any other fraud undersigned counsel has seen, Mr. Frere's companies also provided substantial disclosure regarding the benefits program to each customer. During the initial sales call, every customer received and signed a contract memorializing their purchase of the benefits package.  Evangelist Decl., **Exhibit N** (examples of contracts).  The contract informed the customer of the products and services available through the program (*id*. at FRERE-VIS-006681-6682, FRERE-003806-3807) and the cost of the program (*id*. at 6682, 3807), and it included an authorization form, which again explained the monthly cost and, once signed, allowed the companies to automatically withdraw that cost from the customer's account. *Id*. at 6687, 3814.  Then, after purchasing the program, the customers received an email welcoming them to the benefits program and received bi-monthly emails reminding them to log into their account and access the products available under the program.  Evangelist Decl., **Exhibit O** (benefits package emails).  In addition, in early-2018, the company made available to its FEBC subscribers additional products and services, and at that time, all FEBC members received yet another email introducing them to the new products, and in the process reminding them of their existing program membership.  *Id*. at **Exhibit P** (template for 2018 reminder email).  Finally, some customers chose to "opt out" of FEBC after initially purchasing the membership program.  *Id*. at **Exhibit Q** (victim impact statement indicating customer opted out). Given these disclosures, it cannot be assumed that every customer who purchased a monthly membership in the benefits program did not knowingly make that purchase.

Second, customers who purchased the benefits package have now received repeated notices advising them that they may have been defrauded by Mr. Frere and his companies, but relatively few have come forward to say they believe they have been defrauded.  The notices began in June of 2018 when, after the FTC filed suit, they sent multiple notices to the companies' customers informing them that FEBC and Ameritech have been sued "for deceptive practices," that their "monthly payments to Ameritech and FEBC **do not** go toward paying your student loans," advising that "FEBC charges [ ] for access to the companies' informational

**Defendant's Restitution Submission**
*United States v. Brandon Frere*

resources" and that they can cancel their membership without affecting their student loans. Evangelist Decl., **Exhibit A** (emphasis in original).  These same customers later received notice of the criminal action against Mr. Frere and were provided a victim impact questionnaire to complete and return.  *Id.* at **Exhibit B**.  Despite being given repeated notice that they may have been defrauded by Mr. Frere's companies, only 1,551 people submitted victim impact statements, a number equivalent to 3.65% of the companies' 42,543 individual customers for which the government seeks restitution.  McGuigan Declaration, ¶ 6.

The government's victim impact questionnaire also does little to distinguish between those customers who were misled into agreeing to purchase a membership in the companies' monthly benefits program and those who knowingly did so.  It does not ask the potential victims whether they knew they purchased a benefits package from the companies or whether they understood the costs and benefits of that program.  Answers to these questions would have allowed the parties and the Court to distinguish statutory victims from customers.  If, for example, an individual said they knowingly purchased a membership in the benefits program for a monthly fee, that individual would not be considered a victim under the MVRA because they would not have been "directly and proximately harmed" and would not have experienced an actual loss amount as a result of Mr. Frere's offense conduct.  *Anderson*, 741 F.3d at 951-54.  If, however, the individual responded that they did not understand that they had been paying for access to a benefits program, that person would be a victim and should receive restitution.

The government failed to ask these or similar questions and instead chose to rely on data that reflects only the net payments by the companies' customers, and as a result they have not carried their burden to prove by a preponderance of the evidence which individuals were "directly and proximately harmed," or the actual loss amount suffered by those individuals. *Anderson*, 741 F.3d at 951-54.  Given the amount of disclosure around the benefits program and the relatively small number of former customers who have come forward to say they were victimized despite repeated invitations to do so, the government has not carried its burden to prove by a preponderance of the evidence that every customer who signed up for the benefits

21

program was a victim of fraud and that their payments reflected in payment processor data

constitutes actual loss.[28]

### C. The Court Should Award Restitution to the Individuals who Submitted Victim Impact Statements and Order the Government to Take Appropriate Action to Identify Any Other Victims and Their Actual Loss Amounts in the 60 Days Following the Court's Order

As discussed above, the government's restitution investigation and request has left many

questions unanswered, but one thing is certain: the individuals who submitted victim impact

statements believe they were defrauded by Mr. Frere.[29]  Mr. Frere submits the Court should

credit the victim impact statements and award restitution to each individual who submitted a

statement in the amount they paid to Mr. Frere's businesses, minus $800 to account for the value

of the document preparation services.  This results in a figure of $1,504,372.56.[30]

---

[28] As discussed below, Mr. Frere recognizes and agrees that the mere fact that a customer filed a victim impact statement indicates they believe themselves to have been defrauded.  Mr. Frere credits that belief and agrees all customers who submitted a victim impact statement should be awarded restitution.

[29] In the victim impact statements submitted to the Court, the victims repeatedly say they were misled into believing that their payments to Mr. Frere's companies would be applied to their loan balance.  There is no allegation that Mr. Frere instructed his employees to make such a representation to prospective customers, the contract executed by clients contains a disclaimer to the contrary (Evangelist Decl., **Exhibit N** at FRERE-VIS-006680, FRERE-VIS-003803), and the records submitted with some of the victim impact statements refute any such claim.  *Compare* Evangelist Decl., **Exhibit R** at FRERE-VIS-037946 to 037947, question 9 and 14 (victim stating he believed payments to company would be applied towards his loans) *and* FRERE-VIS-037949 to 037957 (bank records submitted with victim impact statement showing payments to companies and $10 per month to loan servicer) *and* McGuigan Decl., **Exhibit 1** at Row 43, Column D  (notes stating application submitted for IDR of $10 per month); Evangelist Decl., **Exhibit R** at FRERE-VIS-015567, question 5 (victim stating she believed payments to company would be applied towards loans) *and* FRERE-VIS-015601 to 015608 (bank statements showing payments to Department of Education of $53 and $60 per month) *and* McGuigan Decl., **Exhibit 1** at Row 30, Column D (showing reapplication for IDR submitted with estimated $52 per month fee).  However, Mr. Frere recognizes this claim is consistent with victims not understanding they were paying a monthly membership fee for the benefits program.  Mr. Frere agrees that any individual making such a claim should receive restitution in the amount they paid for the benefits program.

[30] This figure is based upon calculations using the spreadsheet produced by the government in June.  McGuigan Decl., ¶ 5.  The defense is still in the process of reviewing the spreadsheets

22

**Defendant's Restitution Submission**
*United States v. Brandon Frere*

1    In addition, Mr. Frere proposes that following the restitution hearing, the government re-

2    contact Mr. Frere's customers and give them another opportunity to submit a victim impact

3    statement.  Mr. Frere submits that during this process the government should use a revised victim

4    impact questionnaire that asks the questions necessary to determine if an individual experienced

5    direct and proximate harm and an actual loss arising from the document preparations services or

6    benefits program they purchased.  The restitution statute provides a mechanism by which these

7    new claims (so long as they are received within 60 days following the restitution hearing) may be

8    compensated through an amended restitution order.  *See* 18 U.S.C. § 3665(d)(5).[31]

9    Limiting the restitution award to individuals who submit victim impact statements not

10    only comports with the MVRA by ensuring that victims who experienced an actual loss are

11    compensated, but it also ensures that those individuals receive full restitution.  Mr. Frere has

12    made available for restitution approximately $9,460,209 both voluntarily and through the

13    forfeiture process.  Evangelist Decl., ¶¶ 20-22.[32]  The government has represented that it will

14    make these funds available as restitution to the victims of Mr. Frere's fraud.  Given the number

15    of victim impact statements received thus far, the Court can reasonably anticipate that the money

16    currently available will fully compensate both those victims who have already submitted victim

17    impact statements and any additional claims submitted within 60 days of the hearing.  Those

18    individuals who submit victim impact statements will thus all be made whole.

---

produced by the government on August 24 and August 25 and will advise the Court of any change to this number at the hearing.  *Id*. at ¶ 6.  In addition, there are 33 individuals who submitted victim impact statements whose names do not appear in the government's June spreadsheet.  *Id*. at ¶ 8.  To the extent the government can confirm these individuals made payments to Mr. Frere's companies, Mr. Frere agrees they should receive full restitution.

[31] Mr. Frere stipulates that good cause exists for such an amended order.

[32] As explained in the declaration of Britt Evangelist, the figure of $9,460,209 is derived in part from the value of the assets in an investment account seized by the government.  This figure assumes the value of the account at the time of Mr. Frere's settlement with the FTC.  The government is in the best position to advise the Court and the parties of the current value of those assets.

23

**Defendant's Restitution Submission**
*United States v. Brandon Frere*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VI.   THE FUNDS FORFEITED BUT RETURNED TO VICTIMS AS RESTITUTION SHOULD BE CREDITED AGAINST ANY RESTITUTION AWARD IMPOSED BY THE COURT

The government has represented that it intends to use the forfeited funds to make restitution to Mr. Frere's victims.  Assuming the government makes restitution to the victims through the DOJ restoration process, (*see* 21 U.S.C. § 853(i)(1)), the amounts received by the victims should be credited against any restitution judgment imposed by the Court so as to avoid double recovery by the victims.  *United States v. Stanley*, 309 F.3d 611, 613 (9th Cir. 2002) ("The purpose of § 3664(j)(2) is to prevent double recovery by a victim."); *Kaplan*, 839 F.3d at 802 ("[I]t would be an abuse of discretion for a district court to issue a restitution award that makes a victim more than whole, such as by awarding a windfall.").  Mr. Frere requests that the Court order the government to notify the Court each time it remits any forfeited funds to Mr. Frere's victims, and that each time the government remits any such funds, the Court credit that amount against Mr. Frere's restitution obligation.

## VII.   THE COURT SHOULD SET A REASONABLE REPAYMENT SCHEDULE FOR MR. FRERE

Pursuant to 18 U.S.C. § 3664(f)(2), the Court is required, "upon determin[ing] the amount of restitution owed to each victim, [to] specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid."  The Court is to consider the statutory following factors in setting a restitution repayment schedule: "(A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled; (B) projected earnings and other income of the defendant; and (C) any financial obligations of the defendant; including obligations to dependents."  This repayment schedule is required if the Court determines Defendant "has insufficient financial resources to make immediate repayment."  *Ward v. Chavez*, 678 F.3d 1042, 1050 (9th Cir. 2012).

As to the first factor, the PSR explains that Mr. Frere "has a negative net worth and cash flow." Dkt. 61, ¶¶ 77-78.  After Mr. Frere is released from custody, he will be a convicted felon, and it is thus hard to determine what his projected earnings and income will be under the second factor.  As to third factor, Mr. Frere has significant financial obligations, including supporting his

24

**Defendant's Restitution Submission**
*United States v. Brandon Frere*

two young children.  *Id*. at ¶¶ 57-58, 77-78.  Mr. Frere therefore requests that the Court order him to pay restitution as follows: (1) payment is due during imprisonment at the rate of $25 per quarter; (2) any amount that remains unpaid when Mr. Frere's supervised release commences is to be paid on a monthly basis at a rate of 5% of Mr. Frere's estimated net income; and (3) after the conclusion of Mr. Frere's supervised release, any amount that remains unpaid is to be paid on a monthly basis at a rate of 5% of Mr. Frere's estimated net income.[33]  The proposed payment schedule will allow Mr. Frere to meet his ongoing financial obligations to his dependents and the victims in this case.

## VIII.   CONCLUSION

For the foregoing reasons, the defense respectfully requests that this Court enter a restitution judgment against Mr. Frere in an amount to be determined based on the already submitted victim impact statements and new victim impact statements submitted within 60 days of the hearing on this issue, but in no event less than $1,504,372.56.  Mr. Frere further requests an order requiring the government to notify the Court of all forfeited funds restored to the victims as restitution and that those amounts shall be credited against Mr. Frere's restitution judgment.  Finally, Mr. Frere requests that the Court enter a restitution payment schedule as described above.

Respectfully submitted,

DATED: August 25, 2021

_____
                              /s/
EDWARD W. SWANSON
BRITT EVANGELIST
Swanson & McNamara LLP
Attorneys for BRANDON FRERE

---

[33] Of course, should Mr. Frere's financial situation materially change in the future, the Court can adjust the schedule of restitution payments to reflect that change, "as the interests of justice requires."  18 U.S.C. § 3664(k).

25

**Defendant's Restitution Submission**
*United States v. Brandon Frere*