STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

SCOTT D. JOINER (CABN 223313)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    Scott.Joiner@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR 19-00493 SI |
| Plaintiff, | **UNITED STATES' RESTITUTION MEMORANDUM** |
| v. | |
| BRANDON FRERE, | |
| Defendant. | |

## I. INTRODUCTION

On December 20, 2019, Defendant Brandon Frere pleaded guilty to one count of wire fraud, in violation of 18 U.S.C. § 1343 (Count One) and one count of international money laundering in violation of 18 U.S.C. § 1956(a)(2) (Count Two). The Court sentenced Frere to 42 months in custody on July 24, 2020. In his plea agreement, Frere agreed "to pay restitution for all the losses caused by all the schemes or offenses with which [he] was charged in this case," and agreed "that the amount of restitution will not be limited to the loss attributable to the counts to which [he pleaded] guilty, pursuant to 18 U.S.C. § 3663(a)(3)." (ECF No. 59, ¶ 10).[1] Although the parties did not agree to a specific restitution amount in

---

[1] Frere also waived his right to collaterally attack or appeal "any aspect of [his] sentence, including any orders related to forfeiture and/or restitution." (ECF No. 59 ¶¶ 4, 5.)

U.S. RESTITUTION MEMO.
CR 19-00493 SI

the plea agreement, Frere acknowledged that the government could seek, and the Court could impose, a restitution amount "up to the amount of total net receipts" from consumers of his companies: American Financial Benefits Center ("AFBC"), the Financial Education Benefits Center ("FEBC"), and Ameritech Financial ("Ameritech"). The factual basis for the plea agreement identified net receipts for these companies between January 1, 2014 and November 29, 2018, as approximately $66 million. (ECF No. 59 at 7:12-14.) As described below, the government seeks total restitution of approximately **$43,713,086** for the actual losses suffered by Frere's victims.

## II.    OFFENSE CONDUCT

During the relevant period (January 1, 2014, through November 29, 2018), Frere owned and operated AFBC, FEBC and Ameritech. He founded and operated AFBC first, which was incorporated in 2011. Ameritech was incorporated on October 28, 2015 and FEBC on October 30, 2015. AFBC operations then transitioned to Ameritech and FEBC. In paragraph two of his plea agreement, Frere admitted to the following facts regarding his scheme to defraud.[2]

AFBC and Ameritech enrolled consumers into a student loan document preparation services program for borrowers who wished to apply for federal loan forgiveness, loan consolidation, and reduced-payment programs through the Department of Education. When AFBC and Ameritech sold consumers "document preparation" services, they also sold consumers a package of "benefits" described as "products and services related to consumers seeking to understand and improve their finances," also referred to as the financial education benefits program.[3] The program provided the opportunity to customers to sign up for services such as LifeLock identity theft protection and roadside assistance. For document preparation services, Ameritech and AFBC clients paid approximately $800. For the financial benefits program, AFBC and FEBC clients were charged an initial enrollment fee of between $100 and $1,200, followed by ongoing monthly membership fees of between $49 and $99 per month.

While AFBC, FEBC, and Ameritech were separately incorporated entities, Frere operated them as one business. For example, profits generated by the sale of FEBC's benefits program were used to

---

[2] All of the facts described in this section are taken directly from the admissions contained in paragraph two of the defendant's plea agreement. (ECF No. 59 at 3-6.)

[3] In the case of Ameritech, the benefits program was sold on behalf of FEBC.

pay some of Ameritech's costs and expenses. FEBC relied on Ameritech employees to enroll consumers into its products, maintain its website and provide customer service.

During the relevant period, Frere instructed his employees to use misleading enrollment practices that caused consumers to agree to sign up for AFBC and Ameritech document preparation services and to purchase AFBC and FEBC benefits packages without fully understanding what they were paying for. He did so by requiring his employees to follow misleading sales scripts and to employ deceptive sales tactics, such as the following: (1) false statements concerning the companies' ability to deliver fixed payments for the life of student loans and loan forgiveness under alternative repayment plans; (2) enrollment practices that improperly inflated a consumers' family size to reduce their prospective payments under federal alternative repayment plans (and therefore make it appear to the consumer that their monthly payments would be lower than what they would have been if family size was not inflated); (3) hiding the monthly fees that consumers would pay for a purportedly optional financial education benefits program while leading victims to believe that the benefits program was already included in the document preparation service.

When initially enrolling consumers in the document preparation service and signing them up for the financial education benefits program (through AFBC and later through FEBC), Frere's employees hid the fees for the financial education benefits program and described the benefits program in a way that made it seem like the cost of the program was included in the document preparation services. Frere ensured that enrollment associates were instructed not to present the benefits program as an optional or additional service to the document preparation service. In addition, instead of being required to disclose the benefits and costs of the FEBC program, enrollment associates were instructed to refer to the FEBC membership program and the Ameritech document preparation services collectively as "the program" or "our program." They likewise were instructed to refer to the fees and costs associated with the Ameritech document preparation services and the FEBC membership collectively as fees for "the program" or "our program." Frere knew and intended that this practice would result in consumers purchasing the AFBC and FEBC benefits packages without knowing they were doing so.

Frere also instructed his enrollment associates on how to manipulate the borrower's family size. Family size is a key variable in determining the amount of a borrower's monthly payments under the

Department of Education's loan forgiveness plans. Regulations limit those included in "family size" to the borrower, the borrower's spouse, children who receive more than half their support from the borrower, and other persons who both live with and receive more than half their support from the borrower. 34 C.F.R. § 682.215(a)(3). Enrollment associates manipulated family size by, among other things, providing misleading examples as to who qualified as a family member under the family size definition. The reason for this was simple: the higher the enrollment associate could get the consumer's family size, the lower the enrollment associate could set the consumer's monthly payment, and the more likely it was that the consumer would enroll in document preparation services and the financial education benefits program.

### III. LEGAL STANDARD

The Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, requires restitution to victims of criminal offenses, such as wire fraud, where an identifiable victim has suffered pecuniary loss. *See* 18 U.S.C. § 3663A(c). Under the MVRA, a victim is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered, including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). The purpose of restitution under the MVRA is not to punish the defendant, but to make victims whole by restoring the value of the losses suffered as a result of the defendant's crime. *See United States v. Crandall*, 525 F.3d 907, 916 (9th Cir. 2008) (citing *United States v. Gordon*, 393 F.3d 1044, 1052 n.6 (9th Cir. 2004)).

The MVRA requires the Court to order restitution in the amount of the victim's actual loss. *United States v. Anieze-Smith*, 923 F.3d 565, 571 (9th Cir. 2019). When the case involves a conviction for a fraudulent scheme:

> [R]estitution may be ordered for all persons directly harmed by the entire scheme. Such restitution is not limited to harm caused by the particular counts of conviction (as it would be absent the scheme element). In this context, a restitution order may be based on related but uncharged conduct that is part of a fraud scheme.

*In re Her Majesty the Queen in Right of Canada*, 785 F.3d 1273, 1276 (9th Cir. 2015) (citations omitted). The Ninth Circuit also "takes a broad view of single scheme." *United States v. Morse*, 785

F.2d 771, 774 (9th Cir. 1986) (noting that "the defrauding of different people over an extended period of time, using different means and representations, may constitute but one scheme.") (citations omitted).

The remedial purpose of the MVRA grants "district courts a degree of flexibility in accounting for a victim's complete losses," but the court "may utilize only evidence that possesses sufficient indicia of reliability to support its probable accuracy." *See United States v. Waknine*, 543 F.3d 546, 557 (9th Cir. 2008) (internal quotation marks, brackets, and citations omitted). In this regard, the Ninth Circuit recognizes that "victim affidavits will generally provide sufficient, reliable evidence to support a restitution order." *Id.* The government bears the burden of proving restitution amounts by a preponderance of the evidence. *Anieze-Smith*, 923 F.3d at 571 ("[The MVRA] minimally requires that facts be established by a preponderance of the evidence ....") (citation omitted).

## IV.  ANALYSIS

### A.  All Fees Paid to Frere's Companies Qualify as Actual Loss Subject to Restitution

All of the fees Frere's victims paid to his companies qualify as actual loss subject to restitution. As described above and in the plea agreement, the entire premise of Frere's companies was fraudulent. In addition to the hidden fees for a worthless financial "benefits" program, the "document preparation" services sold by the companies was based on false promises of future loan forgiveness and significantly reduced monthly loan payments. For example, as Frere admitted in his plea agreement regarding the manipulation of the victim's family size: "The reason for this was simple: the higher the enrollment associate could get the consumer's family size, the lower the enrollment associate could set the consumer's monthly payment, and the more likely it was that the consumer would enroll in document preparation services and the financial education benefits program." (ECF No. 59 at 4-5.)

More importantly, during the enrollment process victims were systematically led to believe that their loan payments would be covered by the monthly payments they were making to Frere's companies. (ECF No. 59 at 5 ("Because of the above practices, consumers were led to believe that they were only purchasing the document preparation services and that all of the fees and costs they agreed to pay were related to either the document preparation services or their monthly payments to their loan servicers.") There is not a single victim that has indicated to the government that they would have paid for stand-alone document preparation services if they had known the truth about the fees they were paying to

Frere. Put differently, there is not a single cent that victims paid to Frere's companies that was not the result of a carefully constructed fraud.

As noted above, the Court is provided a certain amount of flexibility in determining loss amounts in the face of a pervasive fraud scheme. *Anieze-Smith* is a useful example. In that case the defendant challenged the district court's factual determination that all power wheelchair claims billed to Medicare were fraudulent, arguing that the government should have been required to show that the beneficiaries did not in fact need the wheelchairs billed to Medicare. *Anieze-Smith*, 923 F.3d at 570. The Ninth Circuit disagreed and, applying a clear error standard to the district court's factual determination, noted that:

> The evidence presented at trial showed: (1) that bona fide power wheelchair claims are generally very rare because power wheelchairs are an item of last resort, (2) that an inordinately high percentage of ITC's claims related to power wheelchairs, (3) that a large percentage of ITC's referrals originated from doctors at compromised clinics, and (4) that fraud permeated ITC's billing records. The district court could reasonably infer, based on the evidence presented, that all of ITC's billing for power wheelchairs was fraudulent

*Anieze-Smith*, 923 F.3d at 570–71.

Here, just as in *Anieze-Smith*, fraud permeated the enrollment process for every victim – including carefully calibrated sales scripts designed to trick victims into signing up with Frere's companies. The document preparation fees and benefits program were sold as a package, simply referred to collectively as "the program." (ECF No. 59 at 5:16.) It would therefore be inappropriate to carve out any of the fees generated by Frere's scheme from his victims' actual losses. Whether it was document preparation services or the financial education "benefits" program, all of the companies' services were sold together as part of a scam that hooked its victims with the false hope of student debt relief through payments to Frere's companies.

B.   **Restitution Calculation**

As explained in the attached Restitution Report, the government's forensic accountant relied primarily on data from third party payment processors utilized by Frere's companies to calculate restitution.[4] *See* Declaration of FBI Forensic Accountant Marlene Smith filed concurrently herewith

---

[4] It was necessary to utilize third party payment processor data because the massive cloud

("Smith Decl."). This encompassed more than 200,000 lines of data for more than 40,000 victims.[5] To identify victims, the government also utilized a spreadsheet of more than 40,000 customers that was produced by Ameritech during civil litigation with the Federal Trade Commission (FTC). The analysis of payment processor data was then supplemented with a review of sworn victim affidavits (victim impact statements or "VIS"). The government received more than 1,000 VIS in this matter which encompassed, with supporting records, greater than 10,000 pages of materials.

Because of known data limitations,[6] after identifying loss amounts based on the payment processor data, the government then identified loss amounts in victim impact statements that were greater than the amounts provided by the payment processors. If the VIS included supporting documentation and indicia of reliability, the government then revised the loss amount to the higher amount. If the VIS did not contain supporting documentation, or the supporting documentation was insufficiently reliable, the government did not include the higher amount and instead relied exclusively on payment processor data.

The government also performed the same exercise for victim impact statements that did not have corresponding payment processor data. Sworn victim impact statements with back up documentation and sufficient indicia of reliability were included in the government's restitution total. Victim impact statements without backup documentation or insufficient records were not included in the restitution total.

Through this analysis the government identified total actual losses of approximately

---

database utilized by the companies to track customers payments had been decommissioned and was not available to the government.

[5] Exhibits A-E to the report, as well as the Restitution Schedule, are voluminous Excel spreadsheets that contain personally identifying information for tens of thousands of victims in this matter. If printed they would comprise more than a thousand pages. These files are therefore being filed provisionally under seal with the Court in native format.

[6] As noted in the Restitution Report, Frere's companies received approximately $20 million in fees processed through ACH transactions with Bank of America (BoA). Because BoA did not retain individual level data for these transactions, it was impossible to trace these payments to individual victims. Certain payment processor data was also subject to similar limitations. As a result, differences between payment processor data and amounts reported on victim impact statements were not surprising – or automatically disqualifying for purposes of restitution – given the known limitations in the payment processor data. The government therefore pursued additional investigation to determine whether certain victims were entitled to restitution beyond the fees contained in the payment processor data.

U.S. RESTITUTION MEMO.                    7
CR 19-00493 SI

**$43,713,086**, comprised of $42,457,244 in total net customer fees paid to Frere's companies according to the data provided by third party payment processors, and an additional $1.26 million in loss amounts which were identified in victim impact statements and supporting documents.

## V.   CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court order restitution in the amounts, and to the victims, specified in the Restitution Schedule attached to the FBI Forensic Accountant's report.

DATED:  August 25, 2021                             Respectfully submitted,

STEPHANIE M. HINDS
Acting United States Attorney


_____/s/_____
SCOTT D. JOINER
Assistant United States Attorney